## Case No. 1,890.

### The BRISTOL.

### NARRAGANSETT STEAMSHIP CO. v. PONTON et al.

[4 Ben. 397.][1]

District Court, S. D. New York. Dec. Term, 1870.[2]

COLLISION IN LONG ISLAND SOUND—STEAMER AND BARQUE—FOG—SPEED.

A steamer and a barque came in collision in Long Island Sound, at night, in a fog so dense that a vessel could not be seen at a distance of more than about 300 feet. The barque was sunk by the collision. The steamer was running at her usual speed of sixteen miles an hour. It was claimed, on behalf of the steamer, that that speed was not excessive, because an ordinary fog-horn could be heard at the distance of half a mile, and the steamer could stop in running less than that distance. It was also claimed, that, if she was not run at her usual speed, she would be so deflected from her course, that her pilots would not be able to find their way, in a fog, from light-house to light-house. It was also claimed, that the barque gave no proper signal of her presence: Held, that the calculation as to the fog-horn and the stopping of the steamer was too nice a one, and involved too many contingencies, to make it safe to say that sixteen miles an hour is a moderate speed, in a locality so frequented by vessels, for so large a vessel as the steamer, in so dense a fog; That it was not necessary for the steamer to keep up her speed of sixteen miles an hour, to navigate in safety from light to light; That the barque had a proper fog-horn, and it was properly blown, and there was no fault on her part; That the steamer was solely responsible for the collision.

[Cited in The Hansa, Case No. 6,037; The Rhode Island, 17 Fed. 557; Clare v. Providence & S. S. Co., 20 Fed. 536.]

[In admiralty. Cross libels by John Ponton, owner of the barque George S. Brown, against the steamer Bristol, and by the Narragansett Steamship Company, owners of the steamer, against John Ponton and others for damages sustained by collision. There was a decree in favor of the owner of the barque, and dismissing the libel of the steamship company.

[For denial of a motion to compel the libellant Ponton to give security, see Case No. 1,889.]

Charles Donohue, John McKeon, and Spaulding & Richardson, for the barque.

Robert D. Benedict and Dudley Field, for the Bristol.

BLATCHFORD, District Judge. These are cross libels growing out of the same collision. It occurred about half-past two o'clock in the morning, on the 28th of June, 1869, between the barque George S. Brown, then on a voyage from the city of New York, to Cow bay, in Cape Breton Island, and the steamer Bristol, then on a trip from Fall River, in Massachusetts, to the city of New York. The place of collision was in Long Island Sound, about seven miles east from the Stratford light-ship. The wind was from east to east-northeast. The barque was sailing on her port tack, on the wind, and heading about south or south by east. The course of the steamer was west five-eighths south. There was a dense fog at the time, so that a vessel could not be seen at a much greater distance than 300 feet off. The stem of the steamer struck the port side of the barque, between the fore and main rigging, and penetrated into the barque a distance of some ten or twelve feet, so that the barque soon sank.

The libel against the Bristol alleges that the collision was caused by the running of the Bristol through the dense fog at a great and unsafe and improper rate of speed; that, when the steamer was first heard and seen from on board of the barque, a horn was being blown on board of the barque, and lights were exhibited on her, and that a horn had been blown on board of her for a considerable time previously; that, between the time the Bristol came in sight of the barque, and the time of the collision, the course of the Bristol was not changed; and that, immediately on the Bristol's being heard and seen from the barque, which was almost simultaneous, the helm of the barque was put hard-a-port.

The answer of the owner of the barque to the cross libel filed by the owners of the Bristol against the owner of the barque, contains, in substance, the same averments as the libel against the Bristol, except that it avers that the Bristol, after coming in sight of the barque, starboarded her helm, and that that movement was, with her great speed, the proximate cause of the collision.

The answer of the Bristol alleges that the wind was a six-knot breeze. An answer was filed on the 4th of August, 1869, sworn to by a person named Bacon. An amended answer, sworn to by the same person, was filed on the 13th of October, 1869. Each of these answers avers, that the rate of speed of the Bristol was not a high rate, and was at the rate of not exceeding six knots an hour. The first answer avers, that that was a fair and proper rate of speed in those waters, under those circumstances. The second answer avers, that that was a fair and proper and usual rate of speed in those waters, under those circumstances. The first answer avers, that the Bristol blew her whistle at least once in every minute. The second answer avers, that she blew her whistle as often as was necessary to attract attention, and much oftener than once in every five minutes. The first answer avers, that there was no fog-horn on board of the barque, and none was blown as a signal. The second answer avers, that no signal of the presence of the barque was given to the Bristol until about the moment of collision, when a faint blast on a small horn was given. The first answer avers, that, when the barque was reported, the helm of

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed by circuit court in Case No. 1,892.]

the Bristol was starboarded, and her bells were rung to stop and back, and she had been stopped, and had backed one revolution of her paddle-wheels, before the collision occurred. The second answer avers the same starboarding, and that the engines of the Bristol were at once stopped and reversed, but the collision was then unavoidable. At the trial, the second answer of the Bristol was amended by averring that her rate of speed was not a high rate, but was a fair and proper and usual rate of speed in those waters, under those circumstances, and was at the rate of not exceeding sixteen knots an hour.

The cross libel against the owners of the barque, which is sworn to by the same person who swore to the two answers of the Bristol, and was filed on the 4th of March, 1870, avers, that the Bristol was running at the rate of about six miles an hour, "which is a slow rate of speed for her, her usual rate of speed being about eighteen miles an hour, being run at that reduced rate of speed on account of the fog," and which was a safe and proper rate, and that she was blowing her steam-whistle as often as once in every minute; that, when the barque was discovered, the helm of the Bristol was put hard-a-starboard, and her engines were stopped and backed; that her headway was checked before the collision, though not stopped; that the approach of the Bristol was not known to the officers in charge of the barque until they saw the headlight of the Bristol, and when a collision was inevitable; that this was owing to the carelessness of the watch kept on board of the barque; and that the barque did not use a proper fog-horn, or give any notice to the Bristol of her presence or position, until after the Bristol was seen, and after the barque was seen from the Bristol. At the trial, this libel was amended by making the clause in respect to the speed of the Bristol read, that she was running at the rate of about sixteen miles an hour, and that that was a safe and proper rate.

The master and crew of the barque were admitted as co-libellants against the Bristol, to recover their personal effects.

The questions contested on the trial were, (1.) Whether the Bristol was in fault in running in the fog at her usual rate of sixteen miles an hour; (2.) Whether the proper precautions to avoid collisions were made use of on board of the barque before she discovered the approach of the Bristol; (3.) Whether, on each vessel, when the presence of the other was discovered, proper manoeuvres were adopted to avoid a collision.

1. In regard to the speed of the Bristol, it is claimed that it was not an immoderate rate; that it was a rate not greater than such as would enable her to stop and reverse her engine in time to avoid a collision, in the fog, with another vessel using the proper means of giving notice of her position, after the proximity of such other vessel could be discovered through the use of such means; that a usual and ordinary horn, properly blown on that night, with that wind and that fog, could have been heard at from half a mile to a mile off; that the Bristol was, in respect to the barque, complying with the requirement to go at a moderate speed in a fog, if her speed was not so great that she could not stop herself from full speed before going (taking the shortest distance) half a mile; that her speed, at sixteen miles an hour, was a mile in three minutes and forty-five seconds; that, with the checking of her speed by stopping her wheels, it would take her more than two minutes to run half a mile; that she was able to stop dead in the water from full speed in a space of time not exceeding a minute; that her rate of speed at the time was, therefore, such that she could stop her headway within less than a quarter of a mile; and that she was entitled to notice of the presence of the barque in the fog at the distance of half a mile.

This view assumes, that, if a horn had been properly blown on board of the barque, it would have been heard on board of the Bristol when she was at the distance of half a mile from the barque, or, at least, a quarter of a mile. The argument is, that, as it was not heard at that distance, it was not properly blown. But, the calculation is too nice a one, and involves too many contingencies, to make it safe to say, that a speed of sixteen miles an hour is a moderate speed, in a locality as much frequented by vessels as the Long Island Sound, for a steamer 374 feet long and of more than 3,000 tons burthen, in a fog so dense that a vessel cannot be seen 300 feet off. The wind was a six-knot breeze, blowing from the Bristol almost exactly in the direction she was heading. If, in point of fact, the barque neglected the precaution of blowing a horn when she should have blown it, such neglect will charge her with fault, contributing to the collision. But such fault will not necessarily show that the Bristol was not in fault in keeping up, in the fog, her usual speed of sixteen miles an hour.

As to the view urged, that the rate of speed maintained by the Bristol in the fog, was necessary for the safety of herself and the passengers she had on board, the argument is scarcely worthy of serious consideration. It is claimed, that, in a fog, the steamers on the Sound run from lighthouse to lighthouse; that the pilots know, from experience, how long it will take to run from one lighthouse to another, at their usual rate of speed; that, when they arrive at each lighthouse, they sound till they sight it, and then make it a new point of departure; that, if they should slow in a fog, they would be so deflected, by the winds and the tides, from their usual course, as to make it dangerous to run at all; and that the only alternative of the Bristol, if she could not run at the rate of

sixteen miles an hour in a fog, would be to anchor. This view assumes that it is impossible for the pilot of any steamer to learn how long it will take his steamer to run from one lighthouse to another on the Sound, at any rate of speed except that which is his usual rate in fine and clear weather, and that no steamer can run safely at a less speed than that at which the Bristol usually runs. How is it that a steamer whose usual rate is eight or ten miles an hour, is not, if she maintains that rate, in a fog, on the Sound, without slowing, so deflected by the winds and the tides from her usual course, as to make it dangerous for her to run at all, and yet that the Bristol, if she should maintain, in a fog, on the Sound, a rate of eight or ten miles an hour, would find it dangerous to run because of such deflection? The argument must come to this—that no steamer can run safely on the Sound unless she runs at a speed of sixteen miles an hour—or it amounts to nothing. The view urged is one that considers only the desire of the steamer not to be delayed by the fog. It overlooks entirely the safety of other vessels. The larger and the more powerful the steamer is, the greater the probability, in case of a collision, that it will be with a smaller vessel, and that the latter will suffer and the steamer will escape injury. Such risk, in the long run, the steamer is willing to take, as is seen by her running always at full speed in a fog. She accounts the probable loss to herself, by assuming the risk, as less than the loss would be by running at a slower speed. If, however, she takes the risk, a part of it is the liability to respond to other vessels for damages caused to them through such immoderate speed.

2. I am satisfied, on the evidence, that the horn used on board of the barque was a proper horn, and that it was properly blown, and blown at proper times, prior to the collision. Nor is it shown that there was any want of vigilance or attention on the part of the barque, or any neglect to give to the Bristol any signal, which it was incumbent on the barque to give, either before the approach of the Bristol, or before such approach was known on board of the barque, or after that time.

3. The porting of her helm by the barque when the collision was inevitable, was a proper expedient, and tended to an escape from the blow or from its force. The starboarding by the Bristol was done on her seeing an object on her starboard bow, and in ignorance of the fact that the barque was standing across the course of the Bristol. It cannot be said that porting by the Bristol would have avoided the collision or its consequences, and, therefore, the starboarding cannot be held to have been a positive fault, contributing to the collision.

As no fault is shown in the barque, it follows that the Bristol must be held responsible for the collision. In the suit against the Bristol, there must be a decree for all the libellants, with costs, with a reference to a commissioner to ascertain their damages. The cross libel must be dismissed, with costs to all the respondents.

[NOTE. For affirmance of the decree in the circuit court, see Case No. 1,892.]