## THE RHODE ISLAND.

## THE EBEN FISHER.

*(District Court, S. D. New York.   July 18, 1883.)*

1. COLLISION—STEAMER—MODERATE SPEED IN FOG.
   Fifteen miles an hour in a dense fog, in Long Island sound, is not a moderate speed in a steamer; and where, by moderate speed, a collision would have been avoided, the steamer *held* liable.
2. SAME—SAILING VESSELS.
   Although no express statute then required sailing vessels to slacken sail and go at a moderate speed in a fog, in a thoroughfare where other vessels must be expected to be met, such was, nevertheless, the duty of sailing vessels in the exercise of ordinary prudence in navigation.   The new regulations require this.
3. SAME—SPEED AT NIGHT.
   A rate of speed at night and in a dense fog which is immoderate and excessive for a steamer, is less justifiable in a sailing vessel under the same circumstances, as she has less facilities for quickly stopping and changing her movements.
4. SAME—SCHOONER.
   A speed of seven miles an hour having been repeatedly held excessive in steamers in a dense fog, *held*, therefore, excessive in a schooner, and careless navigation, for which the schooner should be held in fault.
5. SAME—RULE 20.
   Rule 20, requiring steamers to keep out of the way of sailing vessels, cannot be construed to justify in sailing vessels a speed which would be deemed excessive as regards their duty to other sailing vessels which they are bound to avoid.
6. SAME—AMENDMENT OF PLEADINGS.
   Where the libel did not expressly charge excessive rate of speed in the schooner, but the facts appeared in the schooner's testimony, and there being no dispute about them, *held*, the pleadings should be deemed amended accordingly.
7. SAME—MUTUAL FAULT.
   Where a collision took place between the steamer R. I. and the schooner E. F., about 8 P. M., in a dense fog, in Long Island sound, at the commencement of the pilotage ground, where numerous other steamers and vessels should be expected to be met, and the steamer was going at the rate of 15 miles per hour, and the schooner sailing before the wind 7 miles per hour, and the collision would have been avoided had either been going at a more moderate speed, *held*, both were in fault.

8. FLASH-LIGHT.

   Whistles being heard on the schooner during 15 minutes preceding the collision, *held*, that the latter should have exhibited a torch-light.

In Admiralty.

*Benedict, Taft & Benedict,* for the Eben Fisher and owners.

*Miller, Peckham & Dixon,* for the Rhode Island and owners.

BROWN, J. The above cross-libels were filed to recover damages arising from a collision between the schooner Eben Fisher, of which the libelant, Perry, was owner, and the steam-boat Rhode Island, owned by the Providence & Stonington Steam-ship Company. The collision occurred at about 10 minutes before 8 on the evening of April 16, 1880, in Long Island sound, at a point about three miles N. W. from Eaton's Neck light-house, and both vessels were injured.

The Eben Fisher was a three-masted schooner of 298 tons register, loaded with a cargo of between 300 and 400 tons of ice, bound from Wiscasset, Maine, to New York, by way of the sound. A fog set in after 6 P. M., which, prior to the collision, had become dense. The wind was strong from the eastward. The schooner had all her lower sails set, including two jibs, and was making about seven knots an hour on her port tack, on a course W. by S., with the wind nearly aft. She had one seaman on the lookout, about six or eight feet from the stern, and her fog-horn had been blown two or three times a minute for 15 or 20 minutes previous to the collision. The first and second mates and the captain, besides the man at the wheel, were also on deck at the time. The first mate, who was forward, first reported the steamer's white light ahead, estimated at only 150 yards off, and not more than a quarter of a minute before the collision. He says this was seen right ahead; the captain says it was a little on the port bow; the second mate says it was a little on the starboard bow. A few moments afterwards the bow of the steamer was seen coming out of the fog nearly ahead, or a little on the port bow. She passed along the port bow of the schooner, carrying away the schooner's jib-boom and bowsprit, and her guards ran over the schooner's bows, breaking her chain plates and carrying away the fore shrouds and the heel of the bowsprit, and breaking the forecastle deck rails and the capstan. The marks of the steamer's paddle-wheel were shown in the torn and crushed wood-work of the deck. All on board the schooner testify that no change was made in her course about the time of the collision; and she had the proper colored lights burning.

On the part of the steamer the testimony is to the effect that the schooner's red light was first seen and reported about one point on the steamer's port bow; that one bell was rung at once to slow, and the wheel put to port. The lookout testifies that the green light was seen and reported immediately after the red,—as quick as one could speak. The captain and pilots testify that it was 10 or 20 seconds afterwards when the green light came into view, and that this was only about 10 or 20 seconds before the collision; that the schooner's

jib-boom and bowsprit struck the port side of the steamer in range of
the pilot-house, about 65 feet from the stem; that her wheel was at
that time hard a-port, and that the engine had stopped. By the col-
lision her paddle-wheel was disabled, five or six arms being broken
and doubled up; the shaft was sprung back, and the journal broken,
obliging her to come to anchor in Huntington bay.

The witnesses from the steamer also testify that the fog was dense
at the time of the collision, having set in about 6:40 P. M., where the
steamer then was; that she was pursuing her usual course upon one
of her regular trips from New York to Stonington; that her full speed
is about 18 miles per hour, in fair weather, under 19 revolutions of
her engine per minute; that after the fog set in her engine was slowed
to 16½ revolutions, which was the ordinary fog speed, making about
15 miles per hour; that by proceeding on her daily trips, always
upon an exact course and upon a fixed speed of her engines during
foggy weather, the position of the steamer at a given time is known
almost precisely; and that on the evening of the collision she was
going on her usual exact course, and at her usual fog speed; that
after passing Execution rocks the course of the steamer, at 6:48, was
shaped as usual for Captain's island, on a course N. E. by E. ½ E.
for 31 minutes, and then changed to a course E. by ⅝ N., so as to
pass about 2½ miles north of Eaton's light, in 39 minutes, at fog
speed. The collision took place after they had been running upon
the latter course 31 minutes. The fog-horn from Eaton's light was
heard on the steamer, for about 10 minutes before the collision, every
20 seconds. The steamer's rudder-wheel was moved by steam, and
goes over to hard a-port in 20 seconds. The wheel had been started
to port immediately on the report of the schooner's red light, and had
got hard a-port about 10 seconds before the collision, making a change
in the steamer's course of about 2½ points to starboard. Shortly after
the first bell to slow was given, the second bell was given to stop.
The engineer testifies that he felt the list of the steamer from the
shock of the collision about the time he had the engine stopped, and
that if he had got bells to back at the same time with the first bell,
he would not have been able to get the engine backing before the
collision.

Though the discrepancies in the testimony are less than usual in
such cases, there are some difficulties not easily reconcilable. If only
the red light of the schooner was in range of vision, and that was one
point on the steamer's port bow half a minute before the collision,
and the steamer went to starboard over 2½ points, her speed being
double that of the schooner, it is difficult to understand how the col-
lision could have happened. The schooner could not have luffed
much, so as thereby to have brought about the collision, notwithstand-
ing the steamer's change to starboard, for in that case the schooner
would have struck the steamer more nearly approaching a right an-
gle. I think it most probable that the vessels were approaching

nearly end on, the schooner being a little on the steamer's port bow, and her course being nearly opposite and crossing that of the steamer, and diverging from it about half a point to the southward; and that both lights of the schooner were in a position to be seen at the same time, but that the red was first distinguished in the fog, and the green one very shortly afterwards seen and reported.

It is not necessary, however, in this case, to dwell on any of the minor points in controversy, as there are clear grounds, concerning which there is no dispute, on which, I think, both vessels must be charged with negligence contributing to the collision.

1. The rate of speed at which the Rhode Island was going in a dense fog, viz., 15 miles per hour, is far beyond that "moderate speed" which the rules of navigation permit. This has been so often discussed, and the prior adjudications are so numerous and uniform, that it cannot be deemed longer an open question. *The Bristol*, 4 Ben. 397; 10 Blatchf. 537; *The City of New York*, 15 Fed. Rep. 624, 628, and cases cited; *The Pennsylvania*, 12 Fed. Rep. 914.

If the owners of steamers think it more expedient or safer for the lives and property committed to their own care to run in fogs at almost full speed, instead of that much slower and more moderate speed which may enable them to keep out of the way of other craft, it must be understood that if collisions happen they must bear the loss, wholly or in part, unless they are able to show clearly that their legal fault in running at such speed in no way contributed to the accident. *The Pennsylvania*, 19 Wall. 125. In this case not only is this not shown, but the contrary is quite clear; for had the steamer been going at a moderate speed, of say six or eight miles per hour only, she could easily have reversed her engines and escaped the schooner after the latter was sighted.

2. But if steamers, which by their motive power are so much more manageable that sailing vessels, are chargeable with negligence in going beyond a moderate speed in a fog, the same rule must be applied to sailing vessels, which are comparatively helpless, when navigating in a fog a thoroughfare where other vessels must be expected to be frequently met.

No statute, it is true, then required a sailing vessel to shorten sail, and, like a steamer, to go at a moderate speed in a fog. But the exercise of reasonable prudence and caution in navigation, according to all the circumstances of the time and place, is a rule of universal obligation, and disregard of this rule is negligence. *The John Fenwick*, L. R. 3 Adm. & Ecc. 500. If a vessel on the high seas may sail before the wind in a gale under all the press of canvas she can bear, no one would deny that such navigation in the East river would be unquestionable negligence and recklessness.

The express statutory provision requiring steamers in a fog to go at moderate speed, is not an arbitrary enactment, but a statutory rec-

ognition and application, in a special case, of the universal rule which requires prudence and caution under circumstances of danger.    Nor was the statute restricting steamers to a moderate speed designed to sanction or permit an immoderate speed in sailing vessels, where the circumstances demand cautious navigation.    The act was doubtless passed with reference to steamers particularly, on account of the special temptation in their case to continue on at a high rate of speed, and sacrifice sailing vessels to their own comparative immunity.    But the same rule, as a general maritime obligation of prudence and caution in navigation, was applied to steamers before any express statute on the subject was passed; and the general obligation of sailing vessels to moderate their speed according to special circumstances, has been repeatedly recognized.    *The Morning Light*, 2 Wall. 550, 558; *The Rose*, 2 Wm. Rob. 1; *The Virgil*, Id. 201, 206; *The Iron Duke*, Id. 384–386; *The Thomas Martin*, 3 Blatchf. 517, 520; *The Vesper*, 9 FED. REP. 569.    The new regulations (article 13) require moderate speed in a fog in all vessels alike.

If steamers are by rule 20 bound to keep out of the way of sailing vessels, the latter have no right to throw obstacles or to create unreasonable difficulties in the way of their doing so; nor does that rule in any degree exempt sailing vessels from the duty of exercising all reasonable care in their own navigation.    An excessive and unreasonable speed in a densely foggy night, and in the usual track of steamers, is not only negligence and carelessness in itself, but also in the nature of an obstacle and an unreasonable difficulty deliberately put in the way of the steamers' performing their statutory duty.

Such I cannot help considering the speed of the Eben Fisher, under the circumstances of this case.    She had approached the narrower part of the sound where the pilotage ground commences.    She was on the known and ordinary track of numerous steamers passing daily at about that time.    The fog, according to the schooner's testimony, was so dense that even the brilliant white light of the steamer could be seen scarcely more than her own length away; the sea was rough, the wind strong; the schooner, deeply loaded, was making under her five lower sails some seven knots an hour.    It seems to me impossible to hold such a rate of speed in such a situation, and in such a night, other than carelessness, not to say recklessness.    About the same speed, and even a less speed, under similar circumstances, has been frequently held to be immoderate even for steamers, which, through their ability to stop and back almost immediately, have means for avoiding impending danger so much superior to sailing vessels. *The Pennsylvania*, 19 Wall. 125; *The Pottsville*, 12 FED. REP. 631; *The Colorado*, 1 Brown, Adm. 393; *The Blackstone*, 1 Low. 485; *The Monticello*, 1 Holmes, 7; *The Magna Charta*, 25 Law T. (N. S.) 512.

Ordinary care and prudence required the schooner either to avoid the known pathway of the steamers altogether, or else to slacken sail so as to reduce her speed within such moderate limits as were com-

patible with her duty to keep out of the way of other sailing vessels which she might meet and be bound to avoid. All sailing vessels going east that night would be beating and close-hauled, or nearly so; and this schooner, having the wind free, would be bound to keep out of the way. The necessity of her going at a moderate speed in such a night was doubtless more imperative in reference to such other sailing vessels which the schooner might meet, than as respects this steamer, because two sailing vessels meeting would see each other no sooner, but rather at less distance apart, on account of the more brilliant head-lights of steamers, while the means of sailing vessels for avoiding each other when meeting are far less available than those of steamers. The principle of those cases, therefore, which hold that a speed of seven or eight knots in a steamer in a thick fog is not a moderate, but excessive, speed, constituting negligence in navigation, viz., because such a speed is too great to admit of her being able to perform her duty of keeping out of the way of other vessels, applies far more forcibly to a sailing vessel going at the same speed under similar circumstances, in reference to other sailing vessels which she is bound to avoid. And if the navigation of a sailing vessel, as regards speed, is such that it must be held careless or reckless in reference to her duty to other sailing vessels which she is likely to meet, it must be held careless and faulty in reference to steamers also, though the latter are bound to keep out of the way; for there cannot be two diverse rules as to prudence in navigation applicable to the same vessel in the same situation; nor, as I have said above, was the rule requiring steamers to keep out of the way designed to encourage careless or reckless navigation in sailing vessels, or to sanction a rate of speed as against steamers which, as against sailing vessels, must be condemned. To permit this would be to permit sailing vessels to take advantage of the obligation imposed on steamers to go at moderate speed and to keep out of the way, and increase the difficulties of steamers in doing so. To allow sailing vessels to increase their own speed as that of steamers is diminished, would tend directly to thwart the very object of the rule requiring moderate speed, viz., to secure sufficient time to avoid collision; and it would thus convert a rule designed to insure greater safety into an occasion of greater danger. The duty of steamers to keep out of the way is a correlative one, and presupposes that the sailing vessel shall not only observe all the specific statutory rules, but all other general obligations of prudence and caution in navigation which the special circumstances demand. Among the latter must certainly be embraced a moderate rate of speed at night and in a fog, in a thoroughfare where numerous steamers and other vessels must be expected to be met; and a speed which is held immoderate for a steamer under such circumstances, cannot be held moderate or permissible for a schooner.

The great speed of the schooner in this case manifestly contributed

to the collision. At a more moderate rate, even from the time she was seen by the steamer, the latter would have gone clear; and the schooner must, for this reason, be held chargeable with contributory negligence.

This fault is not charged against the schooner in the libel, but it appeared from her own testimony and upon own showing at the trial. There would seem to be no possibility, therefore, of her owners having been misled by this proof, or in any way surprised; nor is it certain that before the trial the schooner's speed was known to the owners of the steamer. The fault was alleged and argued on the final hearing. An amendment of the pleadings would, on motion, have been allowed, as was done in the case of *The Oder*, even upon appeal in the circuit after a final decree in the district court. 13 FED. REP. 272, 283. If the admiralty, like other courts, proceeds *secundum allegata et probata*, and requires proper pleadings to apprise the respective parties of what they are to meet, and to prevent surprise, yet where the facts fully appear without objection, and there is no dispute or question concerning them, it would be a perversion of justice to disregard them; and in such a case the pleadings should be deemed to be amended accordingly; the only question is one of costs. See, also, Roscoe, Adm. Jur. (2d. Ed.) 194; Order 27, § 1, under "Judicature Act."

No satisfactory reason is given why the steamer's whistles were not heard, or, at all events, attended to, on board the schooner. The fog-horn from Eaton's Neck could not be mistaken for them. The two seamen on the schooner seem to have heard these whistles during 15 minutes preceding the collision. That was ample time to have procured and exhibited a torch-light, as required by statute; and in this respect the schooner would seem to have been guilty of inattention and negligence. The direction in which the seamen heard the whistles, about two points on their port bow, showed that the whistles could not have come from Eaton's Neck, and indicated some steamer near the schooner's course. It is impossible to say that the exhibition of such a torch-light would not have done any good; it was one of those occasions when every requirement of the rules should have been observed, and when, through the obscuration of the colored lights by fog till the vessels were near each other, the display of a torch-light might, by its penetrating a few rods further through the fog, have enabled the steamer, notwithstanding her high speed, to have averted the collision. *The Pennsylvania*, 19 Wall. 125; S. C. 12 FED. REP. 914; *The Excelsior*, Id. 203.

Each vessel, therefore, must be held in fault. A reference may be taken to compute the damages to each, and judgment entered for half the excess in favor of the greater sufferer. *The North Star*, 106 U. S. 17; [S. C. 1 Sup. Ct. Rep. 41.]

In the proceeding of the owners of the schooner to limit their liability, they may take the usual order.