## THE ROBERT M. THOMPSON.

### THE AUGUSTA W. SNOW.

(Circuit Court of Appeals, Second Circuit. April 17, 1917.)

Nos. 229, 230.

1. COLLISION ⟐83—STEAM AND SAILING VESSELS—EXCESSIVE SPEED IN FOG.

The steamship Thompson and the schooner Snow, on crossing courses, were in collision 50 miles off Cape Henry, in a dense fog. The Thompson was going at a speed of from 6 to 10 miles an hour, and the Snow at a speed of about 5 miles, with all sails set and drawing, which was not necessary to give her steerageway. The Thompson heard the fog signals of the Snow apparently on her starboard bow, but her captain could not be certain of the direction, and kept on until in sight of the Snow, when it was too late to avoid collision. *Held*, that both vessels were going at excessive speed, in violation of article 16 of the International Rules, Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 326 (Comp. St. 1916, § 7854), and the Thompson also violated such rule in failing to stop and navigate with caution on hearing the fog signals of the Snow; that it could not be said that the excessive speed of the Snow did not contribute to the collision, and that both vessels were in fault and liable therefor.

2. COLLISION ⟐82(3)—FOG—"MODERATE SPEED."

A sailing vessel navigating in a dense fog, with all sails set and drawing, and making her best speed under the wind conditions, is not going at the "moderate speed" required by article 16 of the International Rules, and in case of collision can exonerate herself from liability only by affirmatively showing that her excessive speed could not have caused or contributed to the collision.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Moderate Speed.]

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by Smith Shipping Company, Incorporated, owner of the schooner Augusta W. Snow, against the steamship Robert M. Thompson, American Transportation Company, claimant, with cross-libel. Decree for libelant, and claimant appeals. Modified.

The following is the opinion of Mayer, District Judge:

These are cross-actions arising out of a collision between the schooner Augusta W. Snow (hereinafter called the Snow) and the steamer Robert M. Thompson (hereinafter called the Thompson) on April 1, 1914, in a dense fog, about 50 miles east of Cape Henry, Va. The Snow was bound from Jacksonville, Fla., to New York, with a cargo of yellow pine lumber; the Thompson was bound from Philadelphia to New Orleans, La., by way of Charleston, S. C. Each vessel charges the other with excessive speed, de-

fective lookout, and bad steering. All the testimony was taken on depositions, and presents the usual conflict as to vital questions of fact.

The theory of the Snow is that the Thompson, while proceeding at an excessive rate of speed, changed her course, and, instead of passing the Snow port to port, attempted to cross the latter's bow, a situation which could have been avoided by timely stopping and reversing of engines. The Thompson's theory is that the Snow, while going at an excessive rate of speed, luffed, and was allowed to take a sheer to starboard just prior to the collision, thus striking the Thompson at an angle of about 45 degrees. These theories may be illustrated by rough drawings, as follows:

The contentions of both sides as to the failure to give seasonable and adequate fog signals may be dismissed at the outset.

The first question requiring consideration is the speed of the respective vessels. Unfortunately, there is a divergence in the testimony as to the time of collision; the Snow contending, in substance, that the collision did not occur any later than 1 p. m., while the Thompson contends that it happened about 1:19 p. m.

### Speed of the Snow.

The witnesses for the Snow, except her master, were examined prior to the examination of those for the Thompson, the first being Delk, the mate. Delk took the wheel at 12:30 p. m., and estimated that the schooner was going "about 5 miles an hour on an average, an hour." Upon being asked how he knew this, he said, "I could see, going through the water I can see whether she is going 8 or 5 miles; we had a log, the log will tell." By this he meant, of course, that if his estimate was wrong the reading of the log would correct him. He then said that at noon the log registered "about" 44, and that at the time of the collision or immediately thereafter the log registered "about" 48½, thus indicating a speed of "about" 4½ miles per hour, up to the time of the collision. Upon further examination, Delk, relying on his memory, testified that at 8 o'clock in the morning the reading was 22, "if I am not mistaken," and 44 at 12 o'clock (thus showing an average of 5½ knots from 8 to 12), and 98 at the midnight previous, "if I am not mistaken" (the log starting over again every hundred).

The substance of the testimony of Capt. Armstrong, the master of the Snow, is that her speed was a little less than 4 knots. He testified that he looked at the log (taffrail) at 12 o'clock and found it on 44; that the log was taken out of the water after the collision, examined, put away, and brought to New York, where it was taken to the store of John Bliss & Co., makers of nautical instruments and the makers of this log. There, Armstrong says, it was examined, and it showed a registration at 47.9. (The Bliss affidavit is, of course, inadmissible.) If the collision was at 1 p. m., the above readings would show a speed of 3.9 knots per hour (not 3.7, as Armstrong testifies at page 97 for instance. Probably this is a typographical error.

But the libel puts the collision at 12:50. Too much importance is not to be accorded to the mere fact that the libel states 12:50, because often an inadvertent error is made in pleadings, with only rough data in the hands of the proctors; but, in this instance, Armstrong gave the time as 12:50 to his owners (page 120). If, therefore, the collision occurred at 12:50 instead of 1 p. m., and if the log read at 44 at exactly noon, and at 47.9 at

exactly the time of collision, then the Snow went 3.9 knots in 50 minutes, or 5/6 of an hour, thus showing (if I figure correctly) a speed of 4.68 per hour, or, in round numbers, 4.7 knots per hour.

The logbook of the schooner, which was kept in the mate's room, was lost, and there is no reason to question the testimony as to its loss. The captain, however, kept "a kind of scratch log," part of which was written up before the collision and part filled out afterwards when he arrived at Newport News. (Libelant's Exhibit 3 for identification.) The captain was examined and cross-examined concerning this "scratch log," and in so far that log is before the court. He testified that the last entry in the log was made just after 12 o'clock. and his attention was called to the fact that the figures 50 in the entry 12:50 appeared to have been changed. He admitted that the 50 looked "a little different from the 12," but could not tell whether that was done at the time he wrote it or when it was done. Some sparring was engaged in by the proctors as to the admissibility of this paper. For the purposes of this particular point, it is not important whether the paper be admitted in evidence or not. If in, evidence, it is apparent on inspection that some change has been made in the 50. If not in evidence, the attention of the captain was called to the matter, and, as above stated, he admitted that the figures 50 look "a little different from the 12" which precede them.

Campbell, the cook on the schooner, whose testimony shows intelligence, estimated that the collision occurred between 12:45 and 1 o'clock. In one part of his testimony Capt. Armstrong stated: "After the collision, the steamer swung alongside. It wasn't a minute. I took my (Howard) watch out. It was just 1 o'clock (Eastern standard time), and I called the mate's attention to it." I would say the collision occurred "one minute to 1—one or two minutes before 1." He was then asked, "Might it have been five minutes to 1?" and he answered, "Well, that is a time when a man can't tell very closely, because my attention was to getting the sails in." In any event, the captain looked at his watch *after* the collision, and we all know how easily we are deceived as to short lapses of time, especially in a moment of emergency or excitement.

Upon the testimony, it is impossible to determine with absolute accuracy the precise moment when the collision took place, but, reading all of the testimony together, I am much influenced on this point by the testimony of Delk, the mate, who for about 22 years had served on sailing vessels, and whose testimony, having been taken at the very beginning of the litigation, seems to have the ring of truth. Taking into consideration the calculations which I have set forth, and all the testimony relating thereto, the taffrail log and the captain's scratch log, I am satisfied that Delk was substantially right when he said that the Snow was going about 5 miles on an average, and about 4½ miles from 12 o'clock up to the time of the collision. The probabilities are that she was going close to 5 miles an hour (perhaps a trifle above or under), and this conclusion is fortified by the fact that the Snow was carrying all of her sails, including five head sails, that these sails were drawing full, and that the schooner was making all the speed she could with the wind she had (page 122). Nearly all the witnesses testified that the wind was freshening throughout the day, although Capt. Armstrong testified that there was a gradual decrease in the wind shortly before the collision.

There has been a good deal of discussion as to the conclusions to be drawn from the wind conditions reported by the United States weather bureau at Cape Henry, and as they appear in the logs of the warships Delaware and Kansas; but, in view of the distance of the place of collision from Cape Henry and from the warships, any conclusions based on these data would be affected by a large element of speculation. There is nothing accurate about the velocity of the wind over a large area, and a decrease or moderation at one point will not necessarily be duplicated at the same time at a point some miles away.

Experience has demonstrated that the best source of information upon a question of fact such as this is the credible testimony of seasoned men who are on the scene; and, on all the evidence, I am not satisfied that there was so marked a decrease as materially to reduce the speed of the Snow so as to get it down below (in any event) 4½ knots.

I am not unmindful of the testimony of the witnesses called on behalf of the Thompson, who estimated that the Snow was making 7 or 8 knots an hour, but, after all, these are estimates of interested witnesses on another vessel, made within a short time and under circumstances which do not assure certainty and I prefer to arrive at my conclusions on the testimony of the witnesses of the Snow with the fair inferences which follow from that testimony.

Having concluded, therefore, that the schooner made about 5 knots an hour, the next question is whether she was compelled so to do in order to keep her steerageway. Delk testified that the vessel was a "good steering vessel," and that he supposed she would have steerage at 3 knots, but it would take half an hour to answer the helm, and that he supposed he could hold her on her course at 3 knots (page 40). Armstrong, the captain, testified that in a rough sea he would want 3 or 4 or 4 or 5 knots, while in a lighter sea he could hold the course with a knot and a half or 2 knots; that is, when he had a comparatively smooth sea and a moderate wind (page 149). He also thought that it would not make much difference whether the schooner was light or loaded, although under some circumstances she would hold her course better light than loaded. He testified further that he could have maintained steerageway with less speed, but "we could not avoid running into anything as quick with less steerageway as we could the way we were going; our vessel would not mind our helm as quick" (page 100). "I think," he continued, "we should have as much steerageway as that (meaning the rate at which the Snow was going on the day of the collision) in order to avoid running into any object that might be ahead of her" (page 101).

I am satisfied that the Snow could have kept her course at 3 knots an hour, or, in any event, at between 3 and 4 knots an hour; and that when she proceeded at the rate of about 5 knots an hour, with all her sails set, she was also going at a speed in excess of her necessities for steerageway, and certainly in excess of her duty in a fog as dense as all witnesses agree that this fog was. The mere fact that she was going with all sails set strongly suggests a rate beyond the requirements of steerageway.

### Speed of the Thompson.

If the time of the collision was 12:50 p. m., then on the testimony of the Thompson's officers, and as to the events before that time, it is apparent that the Thompson's speed was somewhere between 6 and 10 knots an hour, and obviously excessive. But timepieces often differ, both on land and sea, and the more satisfactory approach is to analyze the situation on the time as kept on the Thompson and testified to by her witnesses.

From 12:30 p. m., when the chief officers of the Thompson went below, to 12:49 p. m., the Thompson was making her full speed of 10 knots an hour (Brown, pp. 5, 49-50; Cavileer, p. 36). Although, according to Capt. Cavileer, of the Thompson, the fog at about 12:45 was "very dense" (page 37), and according to Brown, the engineer, it was "pretty thick," so that he "could see nothing ahead at all," and could see only "the length of the ship," but not "beyond that") Brown, pp. 49, 50), the vessel was permitted to keep on at full speed for at least 19 minutes.

It is true that at 12:30 the order was given to the engine room to "stand by," but that order at best minimizes, but does not avert, the danger of collision in a dense fog.

Of course, it is true that antecedent carelessness is of no consequence from the standpoint of fault, if not a contributing cause of collision; but this conduct on the part of the Thompson is of service in determining the truth as to the speed of the vessel at and just before the collision.

At 12:49 p. m., according to the engineer's log. there was a signal for stop, although Brown, the chief engineer, does not seem to have an independent recollection of the time of the order (page 31). At 12:53 p. m. there was a signal for half speed ahead (Brown, p. 31); but, as the engines were not reversed, the Thompson would still be going ahead when Brown received the half-speed order (page 32). Brown said, "At the end of 4 minutes (12:49–12:53) I *guess* she would be going about 3 knots *or thereabouts*;" while Capt. Cavileer

thought she was going "probably five mile an hour—that is, only roughly estimated" (Cavileer, p. 39).

The half speed would, according to Brown, "pick us up to *about* 6" (page 33), and it would take only about 2 minutes to bring the Thompson up from 3 knots to half speed, i. e., about 5 knots. From about 12:55 p. m., therefore, the Thompson was going at least at the rate of 5 knots; and in view of Brown's estimate of "about" 3 knots or "thereabouts," and Capt. Cavileer's rough estimate of 5 knots at 12:53, it is safe to say that at 1 o'clock, when the next stop order was received in the engine room, the Thompson was going better than 5 knots. The next signal was full speed ahead at 1:12, and meanwhile the Thompson, according to Brown, was making only one knot an hour or almost stopped; but at 1:12 p. m. Brown again received an order for full speed ahead, and a stop order at 1:15 p. m., and Brown admitted that at 1:15 p. m. he was going full speed. Again, the Thompson stopped, this time at 1:18 p. m., when she started half speed ahead, and the collision occurred according to Brown and Vogel, the second assistant, "about" 1:19.

If the testimony of the engineers is taken, the conclusion is irresistible that at the time of the collision the Thompson was going at somewhere from 5 to 6 knots an hour. If the captain's testimony (page 9) is taken to the effect that the collision occurred when the engines were full speed ahead, then she was going 10 knots for 7 minutes, i. e., from 1:12 to 1:19. Contradictions are sometimes the best indication of truth, but not always, and in this case, on this vital question of speed, the Thompson's story is very unsatisfactory. I cannot escape the conclusion that the Thompson was going either about 6 or about 10 knots per hour for some minutes before the collision, and this conclusion is reached without considering the estimates of some of those on the Snow. The answer "No" of Lawson, the Snow's lookout, to the question, "You couldn't tell whether the steamer was going ahead or not, could you?" is not significant. The question, in a sense, was casual, but, if taken at full value, it is merely an instance of the well-known experience that at the moment of emergency (and especially in a fog at sea) it is difficult to recall the precise movement of another vessel.

## The Navigation of the Snow.

Lawson, an able seaman, who had followed the sea for five years, was stationed at the forecastlehead, keeping lookout and blowing the horn. He heard a whistle off his port bow (page 44) and then a second blast half a minute or a minute after (page 45). After these two blasts, Lawson heard several whistles before and several after he saw the Thompson. The Thompson blew one-blast signals after Lawson saw her, and these were answered by three blasts from the Snow. Lawson, who remained on the forecastlehead (page 53), reported the first whistle to the mate, but not the subsequent signals. There was not any necessity for Lawson to do any more, and fault cannot be attributed to the Snow on account of her lookout.

As to the movement of the vessels, the testimony of Delk seems trustworthy. As stated supra, he was an experienced man, was examined before the cross-libel was filed, and his answers seem neither cocksure on the one hand nor indefinite on the other. Shortly before the collision he heard the whistles of a steamer, but "they sounded far off, * * * one was on the starboard quarter one was about abeam" (Delk, p. 7). Capt. Cavileer, of the Thompson, testified that at 12:48 he heard a steamer's whistle off his port bow, and at 12:53 that he heard the same whistle, which was then abeam (Cavileer, pp. 5 and 6). Apparently, therefore, the two whistles of the same steamer were heard on both vessels. Thereafter, and about 2½ minutes before the collision, Delk heard another whistle about three points off his port bow, and shortly after that another, which sounded almost ahead, it being one long blast, and soon thereafter the Thompson loomed up out of the fog across the Snow's bow. When the Thompson loomed up out of the fog, she blew two blasts. As soon as Delk saw the Thompson he put "the wheel hard up, and the captain came and gave me a hand, and we put it hard astarboard" (Delk, p. 9). This maneuver would, and according to Delk did, send the Snow to port.

The Snow struck the Thompson on the starboard side. The Snow sank, floating on her lumber. The Thompson was out of sight in a few seconds, and did not stand by and offer assistance. Lawson, the lookout, Campbell, the cook, Barton, a passenger, and Capt. Armstrong, corroborated Delk on the point that the Thompson's whistle sounded off the port bow of the Snow. Capt. Armstrong testified that at the time of the collision he was at the wheel, that he saw the compass every half minute and at the time of the collision, was looking right at it, that the course was N. N. E., and had not been changed. He further said that, as soon as the Thompson was crossing the Snow's bow, he told the mate to put his wheel hard astarboard, and caught hold of the wheel in order to assist Delk to do this quickly; that the course of the Snow might have been changed by this maneuver, but not enough to notice. "In fact, we came together so quick the compass didn't have a chance to angle the vessel; if the vessel swung off, the compass didn't change any; she might have changed a little, but very little" (Armstrong, p. 96). In the opinion of Armstrong and Delk, the Thompson was heading E. S. E. at the time of the collision, at an angle of about 45 degrees. I am satisfied that the Snow held her course, with possibly some very slight and immaterial change practically at the moment of collision.

## The Navigation of the Thompson.

An appreciation of the situation with which the captain of the Thompson was confronted may be summed up in a reference to his testimony on cross-examination (page 40): "Q. In your direct examination you said, 'Apparently on our starboard bow.' You are not positively sure, are you, that you heard it off your starboard bow? A. In my direct examination I said that the first I heard of the horn was very indistinct, and appeared to be on our starboard bow, but I could not quite detect where it was or what it was." It thus appears that although the master of the Thompson heard the fog horn of the Snow, and although he was not sure of her location or of the direction in which she was going, nevertheless he did not stop for a continuous period nor did he reverse his engines.

After the Snow came in sight, Capt. Cavileer said he starboarded his helm, then ported, and put his helm amidships. The helmsman, Belish, contradicted the captain, saying that he kept the wheel over "to the left" right up to the time of collision, and "didn't turn the wheel amidships at all" (page 104). But, assuming the captain's recollection to be correct, these confusing maneuvers were indulged in undoubtedly because of the fear of the captain that he would throw his stern in the path of the Snow, and, naturally, when the dangerous situation was apparent, he was endeavoring to do everything in his power to avoid collision. It is by no means unlikely that these changing maneuvers, hurriedly executed, gave to the witnesses on the Thompson the impression that the Snow luffed; but luffing by the Snow would be so unusual, in the circumstances, that it would require a great deal more than is presented in this testimony to carry that suggestion into conviction. The truth of the matter is that, proceeding at an excessive rate of speed, the Thompson came upon the danger much sooner than was expected, and in the alarming surprise her captain was compelled to try to avert collision in a very small space of time. Under the circumstances, these maneuvers cannot be said to have taken place in extremis, for the captain brought the situation on himself by reckless speed, when it would have been easy to stop and reverse.

Shanks, the first officer, did not make a very good witness, but I am reluctant to believe that this was anything more than the poor showing which men of this kind sometimes make when in the hands of lawyers. Shanks had an experience on the sea of 28 years, and for 9 years held a master's license for all ocean, steam, and sail, and it is difficult to believe that such a man would not know the simple movements of the helm and the simple results therefrom. Belish, the wheelsman, was an Austrian, unable to speak English; but I do not see that he made any error, but, on the contrary, simply did the physical acts which carried out the instructions of his superiors. I think in his case the criticism of the proctors for the Snow is largely based upon his

lack of knowledge of the English language. It may very well be that it would be wiser to employ, for positions of this kind on a vessel commanded by officers who speak English only, men who also can understand English; but, as I am unable to see that Belish made any mistake, I think that his lack of knowledge of the language is a matter of no consequence. The same observations may be made as to Siguro.

While I think that no fault is attributable to Belish or Siguro in the performance of their duties, yet their testimony, when read in the light of that of the captain and others on the Thompson, is so muddled and unsatisfactory that the Thompson has failed to carry the burden of proof which rests upon her to free herself from fault. On the other hand, the testimony on behalf of the Snow (with the exception of Armstrong's testimony as to the 12:50 entry, and possibly his testimony as to decrease of the wind velocity) is, in substance, clear and satisfactory.

From the foregoing it has already appeared that I am of opinion that both the Thompson and the Snow were proceeding at an excessive rate of speed, in view of the pending conditions. It is quite clear from the testimony that very little deviation would have avoided the collision. Shanks testified that the courses were practically parallel, and that "she (the Snow) would have gone clear of us the way she was going when I first saw her"; and, in effect, he attributed the collision to the luffing of the Snow. Capt. Cavileer testified that the Snow was "about one point of being parallel with our course," and that she was heading a point toward the Thompson. In answer to the question as to whether it appeared that the Snow at that time, if she held her course, would come into collision or go clear, he answered, "It appeared that she would clear me, * * * cross my stern, * * *" would go "under my stern" (pages 14 and 15), and he also attributed the collision to the luffing of the Snow. Capt. Cavileer further testified as follows: "Q. When you first saw the schooner she was heading in the direction which would lead right into the steamer, which I observe from your exhibit marked Exhibit K? A. Not right into her; no. Q. Well, I will ask you to look at that exhibit, Captain. A. Witness does so. Q. If your steamer was stopped at that time, and the schooner continued her course, she would have run into the steamer, wouldn't she? A. No, sir. Q. Pretty close to it? A. She would have come close to it, but she wouldn't have touched. Q. How far away would she come? A. From 100 to 150 feet. Q. The schooner would come pretty close to your steamer, wouldn't she? A. She would come from 100 to 150 feet from us" (pages 46, 47).

Finally, it is earnestly insisted upon behalf of the Thompson that the location of the vessels, as shown by various diagrams, supports the theory that the Snow was at fault; but I think that the testimony fully bears out the theory of the Snow that the position of the vessels and their course was as indicated in the rough diagrams supra.

The conclusion is unescapable that, by the exercise of caution on the part of the Thompson, the collision could have been avoided, and the real question in the case is whether, because of her excessive speed, the Snow is to be condemned for contributing to the collision.

The International Rules of Navigation, as far as here applicable, are (stated for convenience) as follows:

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard for the existing circumstances and conditions. A steam vessel hearing apparently forward of her beam, the fog-signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

"Art. 20. When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel.

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed.

"Note.—When, in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the

giving-way vessel alone, she also shall take such action as will best aid to avert collision."

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

It is unnecessary to repeat at length the principles which the courts have frequently announced in connection with the speed of vessels in a fog. It was clearly the duty of the Thompson, in view especially of the doubts entertained by her captain, either to slacken her speed to a rate considerably under that which she was going, or to stop or to reverse, and, had her captain done any one of these three things, the collision would, in all probability, not have happened.

In considering the liability of the Snow, it is, of course, necessary to ascertain what difference, if any, a slower speed would have made in the particular situation here under consideration. The proposition involved is concisely and aptly stated by Sir James Hannen in The Zadok, 9 P. D. 114 (1883), in referring to article 13 of the "Regulations for Preventing Collisions at Sea": "It was the duty of both vessels to note article 13, to go at a moderate speed, and it appears to me that the object with which that rule of conduct is imposed is not merely that vessels should go at a speed which will lessen the violence of a collision, but also that they should go at a speed which will give as much time as possible for the making of any proper maneuvers which may become necessary under unforeseen circumstances; for, in a fog, it cannot be told exactly from what quarter the danger may come."

The Snow kept her course and speed, and I am satisfied that a slightly less speed, of say a knot an hour, would not have enabled her to clear the Thompson. In any event, in view of the Thompson's conduct, I am not convinced that the collision could have been prevented if the Snow had been running at say 4 knots at the time when the Thompson loomed up out of the fog.

Of course, as the cases have repeatedly pointed out, it is neither possible nor advisable to lay down any rigid rule as to the precise rate of speed at which a vessel shall proceed in a fog. There are some rates which are obviously dangerous, but there are other rates on the border line, such as the Snow's in this case, where the determination of fault must rest upon all the surrounding conditions and circumstances.

It would unnecessarily extend this opinion to analyze case by case, but, from a reading of the many cases cited in the briefs, the principle generally adhered to and certainly followed in this circuit is that sailing vessels should lessen speed in a dense fog down to the rate at which they may maintain steerageway.

Generally speaking, it would seem that where sailing vessels have gone over 5 knots they have been condemned, and where they have gone about 4 knots or under they have been freed; but in each case, naturally, there has been a series of facts which in some one or more particulars differed from those in some other case. In The Chelsea (D. C.) 135 Fed. 616, for instance, the fog was not thick at the beginning, and when the vessel entered the dense fog she was reducing sail. In The Chattahoochee, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801, the sailing vessel was going at 7 miles an hour southeast of Nantucket Shoals. Mr. Justice Brown said at page 548: "No absolute rule can be extracted from these cases. So much depends upon the density of fog, and the chance of meeting other vessels in the neighborhood, that it is impossible to say what ought to be considered moderate speed under all circumstances. It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. It is not perceived why the considerations which demand a slackening of speed on the part of steamers in foggy weather are not equally persuasive in the case of sailing vessels. The principal reason for such reduction of speed is that it will give vessels time to avoid a collision after coming in sight of each other. If two steam vessels are approaching upon converging

courses at a combined rate of speed of thirty miles an hour, and are only able to see each other three or four lengths off, it would be practically impossible to avert a collision; whereas, if each were going at the lowest rate of speed consistent with good steerageway, a collision might easily be avoided by stopping and reversing their engines, or by a quick turn of the wheel and an order to go ahead at full speed. While sailing vessels have the right of way as against steamers, they are bound not to embarrass the latter, either by changing their course or by such a rate of speed as will prevent the latter from avoiding them. There is also the contingency that a schooner sailing with the wind free, as in this case, may meet a vessel closehauled, in which case the latter has the right of way, and the former is bound to avoid her. Beyond this, however, a steamer usually relies for her keeping clear of a sailing vessel in a fog upon her ability to stop and reverse her engines; whereas, it is impossible for a sailing vessel to reduce her speed or stop her headway without maneuvers which would be utterly impossible after the two vessels come in sight of each other. Indeed, she can do practically nothing beyond putting her helm up or down to 'ease the blow' after the danger of collision has become imminent. The very fact that a sailing vessel can do so little by maneuvering is a strong reason for so moderating her speed as to furnish effective aid to an approaching steamer charged with the duty of avoiding her."

While in The Nacoochee, 137 U. S. 330, 338, 11 Sup. Ct. 122, 34 L. Ed. 687, the Supreme Court disregarded the argument that the schooner was sailing too fast because not averred in the answer and not found by the court below, yet the principles stated by Mr. Justice Blatchford are of guidance in the case at bar. Among other things he said, at page 338 of 137 U. S., at page 124 of 11 Sup. Ct. (34 L. Ed. 687): "The steamer was bound to keep out of the way of the schooner, and the burden rests upon her to show a sufficient reason for not doing so. She must·be held wholly responsible, unless she shows a fault on the part of the schooner which contributed to the collision, or that it was due to unavoidable accident. The latter is not shown, and it is shown that the steamer was not going at a moderate speed in the fog. It is found that the steamer first sighted the schooner when the latter was about 500 feet distant, and that the fog was dense and hung low down over the water. The steamer, from her own course and that of the schooner, when the former overhauled and passed the latter, must have known, by the lapse of time before she heard the supposed sounds of distress, that when she changed her course, by porting 13½ points, to south-southeast, it was quite likely she would encounter the schooner. She was bound, therefore, to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog. This is the rule laid down by this court in the case of The Colorado, 91 U. S. 692, 702 [23 L. Ed. 379], citing The Europa, 2 Eng. Law & Eq. 557, 564, and 14 Jurist, pt. 1, 627, and The Batavier, 40 Eng. Law & Eq. 19, 25, and 9 Moore P. C. 286. The rule laid down in the last-named case is that at whatever rate a steamer was going, if she was going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate. See, also, The Pennsylvania, 19 Wall. 125, 134 [22 L. Ed. 148]." ·

While excessive speed in a fog on the part of a sailing vessel is to be condemned, it cannot, in a particular case between given litigants, be considered a fault academically, and it is merely repeating a trite principle to say that the inquiry must be whether the violation of a rule of conduct, statutory or otherwise, was the sole or a contributory cause of the disaster.

As the Thompson was clearly at fault, and as the Snow, though going at an excessive rate of speed, was otherwise properly navigated, and as the rate at which the Snow was going did not contribute to the collision, the Snow may have a decree with costs, and in the cross-action a decree dismissing the libel with costs.

Settle decree on five days' notice.

On appeal from a final decree of the United States District Court for the Southern District of New York holding the steamship Robert

M. Thompson solely at fault for a collision which occurred between her and the schooner Augusta M. Snow on April 1, 1914, at a point about 50 miles east from Cape Henry, Va. The collision occurred between 12:50 and 1:15 p. m., a dense fog prevailing at the time.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellant.

MacFarland, Taylor & Costello, of New York City (Willard U. Taylor and Alfred Strickland, both of New York City, of counsel), for appellee.

Before COXE, ROGERS, and HOUGH, Circuit Judges.

COXE, Circuit Judge. [1, 2] The District Judge has stated the facts fully and accurately in his opinion and they need not be repeated here except as they bear upon the speed of the Snow. The conclusion of the District Judge is stated at the close of his opinion as follows:

"As the Thompson was clearly at fault, and as the Snow, though going at an excessive rate of speed, was otherwise properly navigated, and as the rate at which the Snow was going did not contribute to the collision, the Snow may have a decree with costs, and in the cross-action a decree dismissing the libel with costs."

We are entirely satisfied with the opinion of the District Judge regarding the navigation and liability of the Thompson and, therefore, need spend no time in considering that branch of the controversy.

The important question for us to determine is—Was the Snow guilty of negligence? The court after reviewing the testimony reaches the conclusion that the Snow was making about 5 knots an hour, that she could have kept her course at 3 knots an hour and that when she proceeded at the rate of about 5 knots an hour, with all sails set, she was going faster than was necessary to maintain steerageway, "and certainly in excess of her duty in a fog as dense as all witnesses agree this fog was. The mere fact that she was going with all sails set strongly suggests a rate beyond the requirements of steerageway."

The District Judge after carefully reviewing the testimony reaches the following conclusion, which is clearly substantiated by the proof:

"I am of the opinion that both the Thompson and the Snow were proceeding at an excessive rate of speed in view of the pending conditions. It is quite clear from the testimony that very little deviation would have avoided the collision."

The judge concludes his résumé of the testimony by the following statement:

"The real question in the case is whether because of her excessive speed the Snow is to be condemned for contributing to the collision."

That she was going at excessive speed is thus conceded, as it necessarily must be, in view of the proof that she was making at least 5 knots an hour and that all sails were set and drawing. Some of the witnesses testified that she was making seven or eight knots an hour but all agree that she was going as fast as it was possible for her to go with the weather conditions then prevailing. We do not attempt an extended analysis of the testimony for the reason that the crucial question is one of law arising upon undisputed facts. Briefly stated, the facts are these—A schooner collides with a steamer in a dense fog.

The schooner is going as fast as it is possible for her to go. The International Rules of Navigation provide, article 16, as follows:

"Every vessel shall, in a fog, mist, falling snow, or heavy rain-storms, go at moderate speed, having careful regard for the existing circumstances and conditions."

It is, of course, difficult to define moderate speed in all circumstances but it is safe, we think, to define it as something less than top speed or full speed. A vessel that is proceeding as fast as her machinery or her sails will carry her is not going at moderate speed.

In The Pennsylvania, 86 U. S. (19 Wall.) 125, at page 136, 22 L. Ed. 148, Mr. Justice Strong says:

"But when as in this case, a ship at the time of a collision is in actual violation of a statutory rule, intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

In The Bolivia, 49 Fed. 169, at page 171, 1 C. C. A. 221, at page 223, this court said:

"We cannot agree with the opinion of the learned district judge that the fault of the steamship was not contributory to the collision. The burden is upon her to show that it was not and from the nature of the case this cannot be done. If she had been going slower, she would not have reached the place of the collision when the schooner was there."

See, also, The Rhode Island (D. C.) 17 Fed. 554.

We are of the opinion that after having found that the Snow was proceeding in violation of the statute requiring her to proceed at moderate speed the District Court could not find that this negligence did not contribute to the disaster. On the contrary, we are of the opinion that had the rule been followed it is more than probable that the collision would not have happened.

The decree is modified and both vessels are held at fault with the costs of this appeal to the appellant.