**M. P. HOWLETT INC., as owner of the Floating Crane Howlett No. 6, Libellant,\***

v.

**The TUG DALZELLIDO, her engines, tackle, etc., and McAllister Brothers, Inc., Respondent.\***

**No. 67 Civ. 2487.**

United States District Court,
S. D. New York.

March 31, 1971.

---

\* This court has substituted the terms "libellant" and "respondent" respectively for the terms "plaintiff" and "defendant" utilized in the respective counsel's post-trial papers due to the fact that jurisdiction is based upon admiralty law.

**914**

McHugh, Heckman, Smith & Leonard, New York City, for libellant; Stephen J. Buckley, New York City, advocate.

Healy & Baillie, New York City, for respondent; Bruce A. McAllister, New York City, advocate.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

LEVET, District Judge.

This is a suit by M. P. Howlett Inc. against the Tug Dalzellido and McAllister Brothers Inc. for damage to libellant's floating crane, Howlett No. 6, while under tow by respondent's Tug Dalzellido on a voyage from Weehawken, New Jersey, to Reedy Point, Delaware, when the said floating crane Howlett No. 6 sustained damage to her boom off the New Jersey Coast.

### CLAIMS OF THE PARTIES

Libellant claims that respondent was negligent in commencing the voyage despite predicted adverse weather and sea conditions which occurred during the voyage and caused the damage herein. Libellant also contends that the tow negligently continued ahead after the adverse weather and sea conditions were experienced and after the tug mate noticed that the boom of the crane was swaying from side to side but before the boom fell to the deck.

Respondent contends that its crew was not negligent in commencing or in continuing the tow in light of the weather conditions reasonably to be expected and actually experienced. Respondent contends further that whatever damage may have been incurred by the Howlett Crane No. 6 was caused by the inability of the Howlett Crane No. 6 to meet the weather conditions reasonably to be expected due to the inadequacy of her preparation for the voyage or, in the alternative, that the damage was due to libellant's failure to inform respondent that its tow was more susceptible to rolling action of seas outside the harbor and that special and inordinate care would have to be taken in order to expose the Howlett Crane No. 6 only to very mild weather and sea conditions.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. On April 27, 1966, libellant, a Delaware corporation, was the owner of a whirly type crane mounted on a floating steel barge 85 feet long, 36 feet wide, and 8 feet deep (2–3, 183–184).[1] The steel boom, of the gooseneck type, was secured to the crane. The straight part of the boom, from its base, is 65 feet long and the gooseneck end is another 28 to 32 feet (3, 12).

2. Respondent, McAllister Brothers Inc., a New York corporation, was the owner of respondent Tug Dalzellido on April 26, 1966, both of which were within the jurisdiction of this court and within the Southern District of New York (183).

3. On April 26, 1966, libellant engaged the services of respondent McAl-

[1]. Unless otherwise identified, numbers in parantheses refer to pages in the stenographer's minutes of the trial.

lister Brothers Inc. to tow libellant's crane barge Howlett No. 6 from Pier 9, Weehawken, New Jersey, to Reedy Point, Delaware. The Tug Dalzellido was selected by respondent to perform the service (5, 43, 122).

4. On April 26, 1966 and on the morning of April 27, 1966, libellant, through its master mechanic, Daniel Witham, Jr., and seven fellow employees, prepared the Howlett crane for towage. The purpose of the preparation was to insure that the crane would not be damaged in route by the movement of the open sea, particularly to insure that the boom of the crane would not sway from side to side.

The method employed by Mr. Witham was to jack up the counterweight on the back of the crane (9–10) and weld angle irons and stiffeners from the base of the crane to the deck of the barge, thereby securing the crane itself in a fore and aft position (10–11). The boom was secured in the vertical plane by first being lowered in a fore and aft direction to a position where the forward end of the boom was approximately 20 feet above the deck and 28 feet ahead of the bow of the barge, forming a 45 degree angle with the deck (12, 25–26). To prevent the boom from swaying from side to side, two one inch cables were secured from the forward end of the boom to the port and starboard bow cleats, respectively. At the base of the gooseneck portion of the boom, two seven-eighth inch cables (the holding line and closing line) were secured to the aforementioned port and starboard bow cleats, respectively, and tightened by turnbuckles. At the middle of the straight portion of the boom, two cables, each seven-eighths inch wide, were secured to port and starboard quarter cleats, respectively, and tightened by turnbuckles (Libellant's Ex. 1; 12–15).

5. This court finds that libellant's floating crane, Howlett No. 6, was properly and adequately secured for the contemplated voyage, i. e., sufficiently strong to withstand the ordinary perils reasonably expected on the trip.

6. At approximately 6:00 A.M. on April 27, 1966, Tug Dalzellido commenced to tow libellant's crane to Reedy Point, Delaware. By approximately 7:30 A.M. the tow had reached the Narrows of New York Harbor; at that point the crane-barge was placed at the stern of the tug on a bridle and hawser (17, 123, 126–129).

7. At 5:00 A.M. on April 27, 1966, the United States Weather Bureau issued small craft warnings "for northeasterly winds 15 to 25 knots with higher gusts" for Cape May, New Jersey, to Block Island (Long Island). The 11:00 A.M. and 5:00 P.M. forecasts on that day contained the same information (Libellant's Ex. 2).

8. The 5:00 A.M. weather forecast, referred to in Finding of Fact No. 7, was broadcast over WOX, a marine band radio station, at the customary time of 7:15 A.M. on April 27, 1966; it was also available to the Tug Dalzellido upon radio request. Captain DePew did not hear this report, nor was he notified of this prediction; instead, he relied upon a report of the previous night which predicted winds having a maximum velocity of 15 knots (180).

9. Mate Oliver, a crew member of the tug, claimed that he heard the forecast on the radio on the morning of April 27. This court finds that his testimony was inaccurate since he stated that the report predicted "easterly [winds] 10 to 15." (141–142)

10. When the tow passed Sandy Hook, a peninsula several miles to the south of the Narrows, it proceeded southbound along the New Jersey coast. Although the wind velocity had been from 10–15 miles per hour (130, 162) in the vicinity of the Narrows, it intensified to 20 miles per hour at Sandy Hook (141–142). The wave heights increased from 2–4 feet (130, 162) to 5 feet in height (141–142). The testimony also disclosed that the Howlett crane was rolling from side to side in a greater arch (130, 133, 141–142, 162–163).

11. Weather observations from Barnegat Light Vessel, which is 22 miles

south of Sea Girt, New Jersey, at 7:00 A.M. on April 27, 1966, indicated northeast winds of 20 knots with wave heights of 8 to 9½ feet. At 1:00 P.M., the Vessel reported winds of 21 knots, easterly, with wave heights of 8 feet (Libellant's Exs. 13, 13A, 14; 186–190).

The weather station at Atlantic City, New Jersey, which is 46 miles south of Sea Girt, observed northeasterly winds of 20–22 knots, with gusts as high as 32 knots at the aforementioned times (Libellant's Ex. 15; 190–192).

12. While continuing southbound along the New Jersey coast, Mate Oliver periodically observed the turbulent swaying motion of the crane's boom (154–156, 158) but did not stop the voyage or inspect the crane to determine the nature or extent of this movement.

13. While proceeding down the New Jersey coast, the crew members of Tug Dalzellido requested permission from their dispatcher, by radio, to return to Weehawken due to the inclement weather conditions which they experienced (74). They were instructed to proceed, if possible.

14. At about 1:00 P.M. on April 27, 1966, when the tow was seven miles seaward of Sea Girt, New Jersey, the boom of the Howlett crane fell to the deck of the barge; the tow was stopped and it returned to New York harbor (154–158, 185–186).

15. The proximate cause of the damage sustained by libellant's crane was the excessive rolling action of the predicted unfavorable sea on the day in question (77–79, 92–95, 215).

16. This court finds that respondent's crew was negligent in failing to ascertain the predicted inclement weather conditions before departing on April 27, 1966 and that, as a result, libellant's crane was exposed to the predicted unfavorable weather.

17. This court further finds that respondent's crew was negligent in not stopping to inspect the inordinate swaying motion of libellant's crane while in transit and that this failure to ascertain the condition of the boom was a substantial factor in producing the damage sustained.

18. This court finds that Tug Dalzellido was negligent in continuing its voyage in light of the adverse weather conditions which existed and the swaying movement of libellant's crane and that such negligence was a substantial factor in producing the damages sustained by libellant.

19. When the crane barge arrived at libellant's pier, she was inspected by various surveyors who agreed upon the extent of the damage, the repairs necessary and the reasonable cost thereof. The repair cost has been stipulated in the amount of $24,367.[2] Additionally, the services of a surveyor in the amount of $474 were accepted as an item of damages for a total amount of $24,841 (192).

## DISCUSSION

### NEGLIGENCE OF RESPONDENT

■ The general principles of law relating to towage are well settled. Although a tug is not liable as an insurer or common carrier, it owes a duty to exercise reasonable care and maritime skill as prudent navigators employ in the performance of similar services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932).

■ Reasonable care and maritime skill necessitates that attention be given to the special circumstances involved in undertaking a specific task. National Transport Corp. v. Tug Abqaiq, 418 F.2d 1241 (2nd Cir. 1968). See also Detyens Shipyards, Inc. v. Marine Industries, Inc., 349 F.2d 357 (4th Cir. 1965); Curtis Bay Towing Company of Virginia, Inc. v. Southern Lighterage Corporation, 200 F.2d 33 (4th Cir. 1952); South Inc. v. Moran Towing & Transportation Company, 360 F.2d 1002 (2nd Cir. 1966). Thus, the degree of caution required of a navigator of a tug in

---

2. The stenographer's minutes incorrectly state the amount to be $34,367.

approaching the hazards of the winds and sea must be measured with reference to the character of its tow. The Mercury, 2 F.2d 325 (1st Cir. 1924).

■ A tug is not liable for damage sustained by her tow in the absence of negligence. Allied Chemical & Dye Corp. v. The Christine Moran, 303 F.2d 197 (2nd Cir. 1962). The burden is upon libellant to prove, by a fair preponderance of the credible evidence, that respondent violated its duty of reasonable care.

■ Nevertheless, In every contract of towage, the law will imply that the tower undertakes that he possesses sufficient skill to perform the task safely, that it will use its best endeavors, skill and diligence for that purpose * * *. Sanders v. Meyerstein, 124 F.Supp. 77, 82 (E.D.N.C.1954).

■ The tow has correlative obligations. The tug master is entitled to assume that the barge in tow is sufficiently staunch and strong to withstand ordinary perils likely to be encountered on a voyage. Curtis Bay Towing Company of Virginia v. Southern Lighterage Corp., supra 200 F.2d at 34. This duty is frequently referred to as the obligation to provide a seaworthy vessel. The burden of proof rests upon the party asserting that a vessel is unseaworthy to establish this fact. Although a presumption of law that a barge is unseaworthy applies when a vessel is damaged in favorable weather, it is inapplicable in the instant controversy. Cf. Glen Southern Shipping Corp. v. Norfolk Towing Corp., 135 F.Supp. 147 (E.D.Va.1955). If a tow is unseaworthy a tug is not liable for its loss unless the defects of the tow are known or so apparent that it would be unreasonable to proceed under the circumstances. Otto Candies, Inc. v. Great American Insurance Company, 221 F.Supp. 1014 (E.D. La.1963).

■ A tug's obligation includes the requirement to assess the nature of the undertaking that it assumes; it must be sufficiently knowledgeable about its vessel, its customer's ship and the interaction of the two upon the sea, weather, etc. to provide merchantable service.

■ A tug's obligation also includes the responsibility to utilize available weather reports so that it can operate in a manner consistent with foreseeable risks. The Katie, E., 46 F.2d 534 (E.D. N.Y.1931). The captain of a tug is chargeable with knowledge of weather predictions whether he knows them or not. The Eagle, 52 F.Supp. 937 (E.D. N.Y.1944).

■ In this respect, libellant has proved that Captain DePew failed to inquire about the weather predictions on April 27, 1967 but instead relied upon the obsolete and inaccurate data of the prior evening. Upon reaching Sandy Hook, Captain DePew testified that "the weather was as bad outside [the harbor] as it had been inside." (163) In spite of deteriorating weather conditions, he continued the voyage without any attempt to up-date the weather data or to ascertain the effect of these conditions upon the crane. Instead, Captain DePew continued to make his decisions on the basis of assumptions which were unfounded, i. e., irrelevant weather predictions. The evidence disclosed that adverse weather was predicted along the New Jersey coast and that it did, in fact, occur (Libellant's Exs. 13, 13A, 14, 15).

Respondent contends that since the weather reports predicted small craft warnings which warn pleasure craft of inclement weather, its failure to ascertain this prediction was inconsequential. While recognizing that the forecast under the rubric of "small craft warnings" did not, itself, require that the Tug Dalzellido postpone the commencement of its voyage, the fact remains, and Captain DePew admitted, that knowledge of this forecast would have been a factor influencing his decision to depart or to continue (163) for it would have given him a different perspective upon which to assess the risks involved.

The evidence also disclosed that the crew members of the tug requested permission to return to New York after experiencing the conditions of the sea and that they were aware that the rolling action of the sea was causing marked stress upon the boom of the crane. In spite of this, the crew members made no attempt to inspect the crane to determine the hazards of continuing the voyage. It appears that the crew members were indifferent and did not appreciate their responsibilities in full.

In summary, respondent failed to assess the dangers of commencing or continuing the voyage and to observe the degree of caution which would have prevented—or at least mitigated—the damages sustained. "One who elects to ply his trade by running time-honored risks may do so at the peril of liability if the risk materializes." Houma Well Service, Inc. v. Tug Captain O'Brien, 312 F. Supp. 257, 262 (E.D.La.1970).

Respondent has asserted three arguments which attempt to exculpate it from liability:

First, it contends that the weather conditions on April 27, 1966 were favorable; thus, libellant must have prepared the Howlett crane in an inadequate manner.

The burden of proving that libellant's crane was unseaworthy rests upon respondent. The John E. Berwind, O., 270 F. 569 (2nd Cir. 1920). Respondent has only provided an argument to the effect that this must have been the cause of the accident since it was not negligent.

Libellant, on the other hand, has provided substantial evidence in its favor:

(1) The International Cargo Bureau certified the libellant's crane for service after annual inspections in 1964, 1965 and 1966 (Libellant's Exs. 10, 11, 12; 30, 65, 185).

(2) The crane was functioning properly on April 22, 1966 (30, 184).

(3) Libellant's master mechanic, Daniel Witham, Jr., who supervised the preparation of the crane for sea, had secured many similar cranes for similar trips. He stated that he observed the same method used previously and subsequently (17–18) without incident. This witness was a credible individual and I believe that his testimony was correct.

(4) Captain A. Holm-Andersen, an expert witness who testified for respondent, stated that the method employed by Witham was reasonable and adequate for the contemplated voyage (218). In fact, the witness approved a Howlett crane for sea that was secured in the same manner as the subject herein involved (221).

(5) The tug's navigator, Mate Oliver, testified that so far as he could determine, the crane was properly secured for the venture (144–145).

(6) The heel pin of the crane, which was in operating condition prior to the voyage (31–33), was fractured during the voyage causing the boom of the crane to fall; the break was clean rather than worn from use (31–33, 93).

(7) Libellant's expert marine surveyor, Harper Simpson, who inspected the damaged crane, testified that the heel pin sheered because of the inordinate swaying of the crane from side to side, which was, in turn, due to the adverse weather experienced (92–95). Captain Holm-Andersen also testified that the damage was caused by the rolling action of the sea (215).

It should be noted that respondent's contention also fails to recognize the responsibility of a tug to adopt to conditions of which it becomes aware, even if caused by the negligence or unseaworthiness of the tow. Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2nd Cir. 1961). Succinctly stated, the rule of unseaworthiness does not justify indifferent handling of the tow. Gulf Wave Towing Company, Inc. v. Mitchell et al., 176 F.Supp. 636 (E.D.La.1959).

Respondent's second argument in defense asserts that if the preparation of the crane was adequate, then the design of the crane was structurally inferior so that it was "unusually susceptible to the moderate wave action" of the

ocean. Respondent argues that it was incumbent upon libellant to notify it of the fragile nature of the crane before departure. In substance, this argument is a variation of the previous contention of unseaworthiness, i. e., the tow was not sufficiently staunch to withstand the ordinary perils which reasonably could be expected.

■ Respondent's defense must fail, however, for the record is devoid of any evidence whatsoever to substantiate this point. To the contrary, libellant has proved that similar cranes had been prepared for similar voyages without incident both before and after the accident in question. Moreover, once respondent was aware of the inordinate swaying of the crane's boom, it still had the opportunity (and the duty) to mitigate the hazard.

■ Lastly, respondent invokes the doctrine of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874) to bar libellant from recovery. Respondent notes that 46 U.S.C. §§ 395, 399; 46 C. F.R. Table 2.01—7(a) requires all seagoing barges of over 100 gross tons to be inspected and that libellant failed to comply with this mandate before departure. The rule of The Pennsylvania dictates that when a libellant has committed "statutory fault," i. e., violation of a statute, the burden rests upon the libellant to establish that its violation of law in no respect contributed to the accident.

Assuming, without conclusively deciding, that libellant's barge should have been inspected, and assuming further that an inspection was not conducted, nonetheless, the rule of The Pennsylvania is not applicable to the present case.

The rule appears to be restricted to instances in which the federal statute violated involved navigation. Thus, if a navigator fails to operate at a moderate speed, The Rhode Island, 17 F. 554 (D. C.1883), or violates the crossing rule, The Britannia, 153 U.S. 130, 14 S.Ct. 795, 38 L.Ed. 660 (1894), or does not maintain a proper lookout, The Madison,

250 F. 850 (2nd Cir. 1918), the rule of The Pennsylvania is applicable.

The situation herein does not parallel the type of violations referred to above. To the contrary, the violation of an inspection requirement is quite similar to a violation of the rule requiring a pilot to be licensed in order to operate a vessel. In the case of The Alice M. Drew, 11 F.2d 376 (E.D.N.Y.1923), the court held that violation of a licensing rule would not invoke the application of the rule of The Pennsylvania. This court holds that the same conclusion is warranted herein. While it may be stated as a generalization that all such statutes are designed to insure that maritime activity will be conducted in a safe manner, I do not believe that the correct interpretation of The Pennsylvania demands its application in the present controversy.

John W. Griffin, author of Griffin on Collision, in commenting upon the above-mentioned distinction, has noted:

"It is submitted that the doctrine of so-called statutory fault properly refers only to faults in navigation. If a navigator resorts to a maneuvre which is forbidden by statute or fails to perform an act of navigation required by statute, the presumption of the *Pennsylvania*, * * * applies. But being unlicensed [in our case, failure to inspect] is not an act of navigation and cannot of itself bring about or contribute to a collision [in our case, an accident]. * * * " (§ 254, p. 579)

■ Even assuming further that the rule of The Pennsylvania is pertinent to this case, I believe that libellant has met the requirements of that decision. In the Second Circuit, the rule has been interpreted to require that libellant prove, as a practical matter, that its violation did not contribute to the accident. This is a deviation from the literal language of The Pennsylvania, which states that a faulting libellant must prove that its wrongdoing "could not have been" one of the causes. See, for example, The Suffolk, 258 F. 219 (2 Cir. 1919); Hen-

ry Dubois Sons Company v. A. S. Ivarans Rederi, 116 F.2d 492 (2nd Cir.), aff'd 313 U.S. 568, 61 S.Ct. 942, 85 L. Ed. 1526 (1940).

There is no necessity in repeating the evidence presented by Howlett which demonstrates that the crane was properly and adequately prepared for the contemplated voyage; in short, the presumption of The Pennsylvania has been overcome.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and the parties in this action.

2. Libellant's crane Howlett No. 6 was properly prepared and secured and therefore seaworthy for a sea voyage along the New Jersey coast from Weehawken, New Jersey, to Reedy Point, Delaware.

3. Respondent's tug, which was responsible for the safe navigation of libellant's crane, failed to perform its duties with such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings, and with such consideration as special circumstances require.

4. Respondent was negligent in proceeding to sea in the face of predicted unfavorable weather insofar as libellant's crane was concerned. This act of negligence was a proximate cause of the damages sustained.

5. Respondent was negligent in failing to inspect the crane when the boom was observed to be swaying from side to side 20 minutes to one-half hour before it fell to the deck of the barge. This act of negligence was a proximate cause of the damages sustained.

6. Respondent's crew was negligent in failing to return to Weehawken harbor when the weather conditions were so hazardous as to put libellant's crane in peril.

7. Respondent's acts of negligence caused the damage to libellant's crane in the stipulated amount of $24,841.

8. Libellant is entitled to recover $24,841 from Tug Dalzellido in rem and from respondent in personam with costs and interest (which shall be determined by the court upon suitable affidavits and memoranda served by the parties and submitted to the court on or before April 9, 1971).

Submit decree on notice in accordance with the foregoing.