**BOUCHARD TRANSPORTATION CO., INC., Plaintiff,**

v.

**TUG GILLEN BROTHERS et al., Defendants.**

**No. 70 Civ. 1648.**

United States District Court, S. D. New York.

Jan. 24, 1975.

Grainger & Tesoriero, New York City, for plaintiff; Celestino Tesoriero, New York City, of counsel.

McHugh, Heckman, Smith & Leonard, New York City, for defendant Henry Gillen's Sons Lighterage Inc.; Richard E. Meyer, New York City, of counsel.

McLaughlin & Lawlor, New York City, for defendant Texaco Inc.; James M. O'Donnell, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

The above-named plaintiff, Bouchard Transportation Co., Inc. ("Bouchard") filed a complaint against two defendants, one against Tug "Gillen Brothers" and Henry Gillen's Sons Lighterage, Inc. ("Gillen"). This was based upon an agreement between Gillen and plaintiff whereby Gillen entered into a contract of towage to transport Barge B. No. 55, owned by plaintiff, to the Texaco pier and terminal on the Hudson River at Albany, New York; plaintiff contends that on or about October 29, 1969, while the Barge B. No. 55 was in tow of Tug "Gillen Brothers" and under the control of said tug, the barge was caused to go aground while approaching the Texaco pier and terminal at Albany, New York allegedly because of the failure of defendant Gillen to perform its contract of towage in a safe, proper and workman-like manner and because of the negligence of Gillen in performing the towage agreement; that as a result thereof

the Barge B. No. 55 sustained severe damage necessitating that it be taken out of service, that extensive repairs be effected and as a result thereof plaintiff has suffered damages in the amount of $30,000.

The complaint in the second cause of action alleges a cause of action against defendant Texaco Inc. ("Texaco"). The gist of this cause of action is that at relevant times defendant Texaco maintained a pier and terminal facility at Albany, New York and impliedly represented that the same would be maintained in a safe and proper manner and invited or directed plaintiff to send its Barge B. No. 55 to the aforesaid premises as a safe berth; further, that on or about October 29, 1969 while the Barge B. No. 55 was approaching said terminal and pier facility it was caused to go aground and sustained severe damages; that the said grounding was in part due to the failure and negligence of defendant Texaco to maintain the approach to its pier and terminal facility in a reasonable condition and its failure to supply a safe berth to plaintiff and in its failure to warn plaintiff of conditions and dangers of which it was or should have been aware.

The complaint alleges that as a result of the breach of its contract by Gillen and the breach of its duty by Texaco to maintain its terminal, the Barge B. No. 55, owned by plaintiff, sustained severe damage necessitating that it be taken out of service, that extensive repairs be effected and as a result thereof plaintiff has suffered damages in the amount of $30,000.

Defendants Gillen and Texaco deny liability by their respective answers and assert cross-claims against each other, alleging that if there is any liability found it is due entirely to the negligence of the other.

Texaco had filed a third-party complaint against Marine Contracting International, Inc., but this cause of action was discontinued by stipulation before trial.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law with respect to liability of each defendant:

## FINDINGS OF FACT

1. On October 29, 1969 plaintiff Bouchard, a corporation incorporated under the laws of New York, was the operator of the Barge B. No. 55, which it owned through a subsidiary corporation. (Tr. 5.) [1]

2. On October 29, 1969 defendant Gillen, a corporation incorporated under the laws of New York, owned, operated, manned and controlled the Tug "Gillen Brothers."

3. On October 29, 1969 defendant Texaco, a foreign corporation incorporated under the laws of a state other than New York, owned, operated and maintained a waterfront oil terminal on the west side of the Hudson River, six miles south of Albany, New York. (Tr. 6, 108.)

4. On October 29, 1969 the Texaco terminal was composed of a main ship dock and a ballast dock. The main ship dock was abutted on each side by a large circular cofferdam, sometimes referred to as a "dolphin." (Tr. 77, 78.)

5. The aforesaid ballast dock was approximately 200–300 feet south of the southern cofferdam and consisted of a circular group of pilings six feet in diameter, connected to the shore by a catwalk. (Tr. 78, 79, 142, 143.)

6. On October 29, 1969 the Esso Company operated an oil terminal south of the Texaco terminal on the west bank of the Hudson River. The Esso terminal consisted of an upper dock and a lower dock. The Esso upper dock was approximately 100 to 150 feet south of

1. References preceded by "Tr." are to pages of the stenographic transcript of the trial.

the Texaco ballast dock. (Tr. 27, 72, 144.)

7. Prior to October 29, 1969 Texaco maintained a black spar buoy, a private aid to navigation, which marked a rock outside the river channel approximately 50 feet due east of the Texaco ballast dock. The exact location of the said spar buoy had been at a point 930 yards, 345 degrees true from the upper Hudson River Light 65. (Tr. 6, 113, 114, 130.)

8. At some time in 1969 Texaco engaged the services of Marine Contracting International, Inc. to dredge the area of its docks to a depth of 31 feet to accommodate deeper draft vessels. From the time when the Texaco terminal was dredged in 1968 until October 29, 1969 the terminal had been servicing vessels with drafts up to 28 feet. (Tr. 6, 121, 142–145.)

9. Subsequent to the dredging performed in 1968 and prior to October 29, 1969 Texaco caused the black spar buoy to be removed, with the approval of the United States Coast Guard, and never replaced it. (Tr. 6.)

10. Prior to October 29, 1969 Texaco, through Paragon, Inc., of New Jersey, a locally-owned subsidiary, had requested Bouchard to deliver 55,000 barrels of oil to the Texaco terminal. (Tr. 6, 106, 107.)

11. In order to make said delivery Bouchard entered into a contract of towage with Gillen under which Gillen agreed to transport the Barge B. No. 55 from New York City to the Texaco terminal. (Tr. 91, 92.)

12. The Barge B. No. 55 was a non-self-propelled oil barge 300 feet in length, 56 feet 6 inches in beam and 22 feet in depth. There was no testimony as to its draft on October 29, 1969. (Tr. 7, 17, 18.)

13. On October 29, 1969 Barge B. No. 55, laden with its consignment of oil for Texaco, was being push-towed by the Tug "Gillen Brothers" en route to the said Texaco Terminal's ship dock. (Tr. 6, 8, 77, 78.)

14. The Tug "Gillen Brothers," while push-towing and in control of the Barge B. No. 55, was proceeding north up the Hudson River in mid-channel at a speed of approximately one to two knots. At that time there was an ebb tide approximately one and one-half hours before its low water at that point. When the bow of the Barge B. No. 55 reached a point directly east of the Esso upper dock, the tug pilot at that time, Henry Petersen, changed the tug's course slightly west to approach the Texaco ship dock. (Tr. 28, 68, 71, 73, 75, 96.)

15. After the tug changed course it proceeded on a straight course at approximately one knot toward the Texaco ship dock, which is the normal course used by vessels approaching from south of the Texaco terminal. (Tr. 76.)

16. At a point approximately 50 feet due east of the Texaco ballast dock the Barge B. No. 55, while being push-towed by the Tug "Gillen Brothers," came into contact with the bottom and was grounded. (Tr. 13, 14, 76, 102.)

17. Henry Petersen, the tug pilot at that time, stopped the tug and turned the bow of the Barge B. No. 55 east and again proceeded toward the Texaco ship dock on a course slightly east of the original course. (Tr. 15, 79–81.)

18. The Barge B. No. 55 was holed on the port side at the No. 2 tank, which tank began to leak oil. It was never determined exactly what the barge came into contact with. (Tr. 15, 29, 30, 45.)

19. However, I find that the point of contact where the Barge B. No. 55 was grounded was approximately at the same point at which Texaco had formerly maintained its black spar buoy, indicating an obstruction on the bottom to all approaching vessels, and that the grounding of the Barge B. No. 55 was the proximate cause of the damage to the No. 2 tank.

20. The approach to the Texaco ship dock used by the tug pilot was the same as that normally used by all vessels approaching the Texaco ship dock from the

south. A normal approach to the Texaco ship dock from the south requires that vessels pass approximately 50 feet off the Texaco ballast dock. (Tr. 30, 31, 145, 146, 149, 150.)

21. Henry Petersen, the tug pilot on October 29, 1969, at the time of this occurrence, had no previous personal knowledge of the depth of the water at the Texaco terminal or the approaches thereto. He had never navigated to the Texaco terminal before and had no instruments, charts, books or diagrams which indicated the depth of the water, and he never made any inquiry in respect to said depth. (Tr. 63, 84, 90, 91, 95, 98–100, 102.)

22. Nevertheless, the tug pilot did have knowledge of the fact that there had been a black spar buoy maintained by Texaco approximately 50 feet directly east of its ballast dock prior to October 29, 1969. When he made his approach to the Texaco ship dock he erroneously estimated where the buoy had been and guided his approach with reference to his estimate. (Tr. 94, 95, 97, 99–101.)

23. In view of the tug pilot's knowledge that a black spar buoy had previously marked an obstruction of the Texaco ballast dock in the area in which he was then navigating the barge and tug, he was negligent in making an approach to the Texaco ship dock, to which he had never been, over waters which he had never previously traversed and with no knowledge of the depth thereof, without endeavoring to ascertain the bottom characteristics. He entered the area with knowledge of possible danger to his tow and made no attempt to ascertain a safe method to approach. (Tr. 91, 94–98.)

24. I find that the tug pilot failed to exercise such reasonable care and maritime skill as a prudent navigator would use in making an approach to the Texaco ship dock.

25. Therefore, the defendant Gillen was negligent and breached its warranty to tow Barge B. No. 55 in a safe and workmanlike manner when it negligently

caused the barge to hit bottom and ground. (Tr. 13, 14, 18, 76.)

26. I find that defendant Texaco was negligent in failing to maintain the approach to its terminal, in particular that area outside the river channel and within its dominion and control, normally utilized as the southerly approach to its ship dock, free of obstruction and safe for vessels approaching said terminal, and that such negligence was a proximate cause of the damage sustained by the Barge B. No. 55.

27. Defendant Texaco had prior knowledge of the limited depth of water at low tide in the area immediately adjacent to the ballast dock. (Tr. 138, 139.)

28. Hence, defendant Texaco was negligent in failing to give warning of the inadequate depth of water in the southern approach to its ship dock, particularly since it was the consignee of the oil. (Tr. 138, 139.)

29. Defendants Gillen and Texaco are equally liable for all damages to be awarded to Bouchard.

## DISCUSSION

### NEGLIGENCE OF GILLEN

The general principles of law relating to towage are well settled. Although a tug is not liable as an insurer or common carrier, it owes a duty to its tow to exercise reasonable care and maritime skill in performing its services commensurate with that which prudent navigators would employ in the performance of similar services. Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699 (1932); M. P. Howlett, Inc. v. Tug Dalzellido, 324 F.Supp. 912, 916 (S.D.N.Y.1971) (Levet, J.).

The authorities here cited below have held that contracts of towage, such as the agreement entered into between Bouchard and Gillen (Finding 11), give rise to an implied warranty of workmanlike service. Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1058–59 (4th Cir. 1969); James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., 245

F.2d 84, 87 (2d Cir. 1957). Although the contract of towage may give rise to an implied warranty of workmanlike service, that "warranty is certainly not tantamount to absolute liability and plainly does not affect the principle that a tug is not liable to its tow in the absence of negligence." In re Moran Inland Waterways Corp., 320 F.Supp. 229, 234 n. 2. (S.D.N.Y.), rev'd, 449 F.2d 132 (2d Cir. 1971).[2] The very nature of a towage contract necessarily implies an obligation to tow properly, safely and competently.

■ A tug is not liable for any damage sustained by its tow in the absence of negligence, which the plaintiff must prove by a fair preponderance of the credible evidence. Howlett, 324 F. Supp. at 917 (Levet, J.). However, when a tug causes its tow to go aground "under circumstances which ordinarily result in no such casualty" the tug has the burden of producing sufficient evidence to show reasonable excuse other than its own negligence. Humble Oil & Refining Co. v. Tug Crochet, 422 F.2d 602, 606 (5th Cir. 1970); Bisso v. Waterways Transportation Inc., 235 F.2d 741, 743–747 (5th Cir. 1956). Such stranding of the tow by the tug establishes a prima facie case of negligence. Humble Oil & Refining Co. v. Tug Crochet, 288 F.Supp. 147, 150 (E.D.La. 1968).

■ The only excuse asserted by Gillen is based solely upon the fact that Texaco had removed the black spar bouy which had formerly marked a submerged rock approximately 50 feet east of the ballast dock and had failed to warn the approaching tug of the inadequate depth of water in that area. (Findings 9, 28.) This plea is not sufficient. Regardless of the negligence of Texaco in failing to maintain the approach to its ship dock in a safe condition, Gillen was obliged to have its tug in the charge of a pilot who had knowledge of the location, nature of the river bottom outside the river channel and the depth of water over any obstructions.

### NEGLIGENCE OF TUG PILOT

■■ A tug pilot must exercise the care and skill of a reasonably prudent navigator in performing a towage contract. Philadelphia Electric Co. v. Curtis Bay Towing Co. of Pa., 260 F.Supp. 505, 512 (E.D.Pa.1966). The tug pilot is himself charged with responsibility for knowledge of the conditions of navigation, including knowledge of channels, depths of water, obstructions, pipelines and other dangers to the tug's tow. Dow Chemical Co. v. Tug Thomas Allen, 349 F.Supp. 1354, 1362–1363 (E.D.La. 1972).

■ Despite the tug pilot's lack of knowledge of the river bottom (Finding 21) and his awareness that prior to October 29, 1969 there had been a black spar buoy maintained by Texaco approximately 50 feet due east of its ballast dock (Finding 22), he guided the Barge B. No. 55 into that area without attempting to ascertain, by any means, the safety of his approach. He had no instruments, charts, books or diagrams which indicated, or could be used to determine, the depth of the water and he never made any inquiry as to such. (Finding 21.) This conduct is not consistent with that which a prudent navigator would employ in exercising reasonable care and maritime skill under similar circumstances and is therefore negligent.

### NEGLIGENCE OF TEXACO

■ It is well-settled law that a wharfinger who invites a party to use its dock facilities is under a duty to exercise reasonable diligence to ascertain the condition of its berths and, if there are any dangerous obstructions, to have them removed or give notice of such to approaching vessels. Grace Line Inc. v.

2. Although this case was reversed, the reversal dealt with the distribution and allocation of damages on a finding that both the tug and the barge were negligent and does not affect the principle for which it is cited here.

Todd Shipyards Corp., 500 F.2d 361, 365 (9th Cir. 1974). The leading case setting forth this basic principle of admiralty law is Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1899). In that case the Supreme Court, quoting the language of Lord Watson in The Calliope, 1891 App.Cas. 11, extended the responsibility of the wharfinger to include the duty to maintain the approaches to its berth as well as the berth itself.

> " * * * 'I do not doubt that there is a duty incumbent upon wharfingers * * * towards vessels which they invite to use their berthage * * * to use reasonable diligence in ascertaining whether the berths themselves, *and the approaches to them*, are in an ordinary condition of safety for vessels coming to and lying at the wharf. * * * ' "
>
> Smith, 173 U.S. at 436, 19 S.Ct. at 444 (Emphasis added.)

See McCaldin v. Parke, 142 N.Y. 564, 568, 37 N.E. 622, 623 (1894).[3]

 Since Texaco had induced the Barge B. No. 55 to approach its ship dock for the purpose of delivering its consignment of oil (Finding 10), Texaco had a duty to ascertain any imminent dangers to said barge as it approached. Texaco had knowledge of the fact that there was a limited amount of water in the area immediately adjacent to its ballast dock (Finding 27) and did not give notice of this danger to vessels making an approach to its ship dock from the south. (Finding 28.) Therefore, Texaco was negligent in having breached its duty to provide a safe approach to its ship dock and in failing to give notice to the Tug "Gillen Brothers" of the limited depth of water off its ballast dock.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this admiralty claim pursuant to 28 U.S.C. § 1333.

2. Defendant Gillen was negligent in failing to perform its duty to transport the Barge B. No. 55 from New York City to the Texaco terminal properly, safely and competently.

3. The tug pilot was negligent in failing to exercise such reasonable care and maritime skill as a prudent navigator would employ under similar circumstances.

4. This negligence was a proximate cause of the grounding and consequent damages sustained by the Barge B. No. 55.

5. Defendant Texaco was negligent in failing to maintain the southern approach to its ship dock in a safe condition for approaching vessels and in failing to provide any warning of the limited depth of water off its ballast dock to such approaching vessels.

6. Such negligence was a proximate cause of the grounding and consequent damages sustained by the Barge B. No. 55.

7. Defendants Gillen and Texaco are equally liable for all damages to be awarded to Bouchard. Dow Chemical, 349 F.Supp. at 1364. That is, each defendant is liable for 50 per cent of the damages sustained by the Barge B. No. 55.

8. Plaintiff Bouchard is entitled to an interlocutory judgment in this action against both defendants Gillen and Texaco. I direct that the question of damages be referred to Magistrate Sol Schrieber to hear and report.

Enter interlocutory judgment promptly upon notice pursuant hereto.

---

3. This decision reversed the lower court's determination because this court found that there was a lack of proof that the obstruction there was in the approach to that defendant's wharf. The present case can be distinguished since there was proof that the grounding did occur in the approach to the Texaco ship dock. (Findings 19, 20.)